Filed 2/20/15  P. v. Turner CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VERGINIA TURNER,<br><br>    Defendant and Appellant. | H039304<br>(Monterey County<br>Super. Ct. No. SS102063A) |

Following a trial, a jury convicted Verginia Turner of first degree murder, finding the killing to be willful, deliberate, and premeditated.  (See Pen. Code, §§ 187, 189.)[1]  At trial, it was not disputed that she had killed Mark Hafen with whom she had been in a relationship.  The defense theory was that Hafen battered Turner, Turner killed Hafen in self-defense or imperfect self-defense, and, therefore, Turner was not guilty of homicide or, at worst, she was guilty of only voluntary manslaughter.  The court sentenced defendant to a prison term of 25 years to life.

On appeal, defendant raises claims of instructional and evidentiary error. Defendant also argues that her misdemeanor offense of brandishing (§ 417) was not a crime of moral turpitude and it could not be used for impeachment.  Lastly, she contends that the cumulative prejudice of the alleged foregoing errors requires reversal.  We find no reversible error and, accordingly, will affirm.

---

[1]    All further references are to the Penal Code unless otherwise stated.

I

*Facts*

A. *The Prosecution's Case in Chief*

*Discovery of the Body*

     Missy Santa Ana worked for Hafen, an attorney, as his legal secretary and office manager for 16 years. Hafen had a heavy calendar on Monday August 30, 2010, but he did not show up to work. That was the first time in 16 years that Hafen had not shown up to work. Santa Ana tried to call Hafen on his home and cell phones several times but he never answered. When Hafen did not show up on Tuesday, Santa Ana tried to contact him on his home and cell phones. She called him over 100 times. Eventually, she went to Hafen's house, knocked on the door, and rang the doorbell. His truck was parked in the driveway but nobody answered the door.

     When Hafen did not show up on Wednesday, Santa Ana unsuccessfully tried to reach him by telephone. Another attorney in the office and Santa Ana went to Hafen's house. They spoke to Hafen's next door neighbor Steve, who said he was going to call for a welfare check. They stayed until police arrived and entered Hafen's home.

     On September 1, 2010, Salinas Police Officer Scott Sutton was dispatched to a residence located at 760 Carmelita Drive, Salinas, to do a welfare check on the resident. Sutton found one open window, removed the screen, and climbed into the master bedroom through the window. The front door and the sliding glass door to the backyard had been nailed or screwed shut. He was able to get into the garage and open the door from the garage to the backyard. Sergeant Shaw, Officer Sparks, and Officer Kevin Orepeza came in and the four officers went to the master bedroom.

     There was a heap of blankets between the bed and the dresser on the ground below the window in the master bedroom. The house had a very bad odor usually found when a person has been deceased for some length of time. Officer Orepeza moved the blankets

2

using a stick from the window and saw a white garbage bag, a lot of fluid, and a head. The officers backed out of the room, began a crime scene log, and secured the residence.

*Investigation*

Salinas Police Officer Raul Rosales was called to the Salinas residence on the afternoon of September 1, 2010 and asked to take photographs of the interior. He observed a metal, possibly steel, bar, approximately two feet long, leaning against the wall in the master bedroom. It appeared to be bloodstained. The bed sheet on the bed appeared to have bloodstains.

Kevin Gardepie, who was assigned as a detective in the coroner's division of the Sheriff's Department on September 1, 2010, was called to the residence that afternoon. When he arrived, he collected information from the officers on the scene.

Detective Gardepie took photographs of the scene. He began to remove layers of bedding from the decedent's body. The detective performed a preliminary examination of the body. He found "major trauma" to the right temple, which was "caved in." The deceased was wearing cotton underwear and a long-sleeved sweatshirt. A white plastic garbage bag had been placed loosely over his head. A large volume of bloody fluid was pooled inside the bag. There was also a bloody pool of fluid on the carpet directly underneath the decedent's head. He noted and photographed blood splatter on the wall to the right of the headboard, over the telephone, and on top of the nightstand. An odor of decomposition emanated from the head region. The body was in a moderate to advanced state of decomposition.

Patrick Haney, who was employed by the Salinas Police Department, was the criminalist in charge of the crime scene unit. At about 7:00 p.m. on September 1, 2010, Haney arrived at 760 Carmelita Drive to supervise the crime scene investigation team and help process the crime scene. The victim had already been removed by the coroner's office.

3

In the master bedroom, there was blood spatter on the nightstand and wall. Haney traced the blood spatter from two different directions back to one source located in the upper right-hand corner of the bed. Using cotton swabs, Haney collected blood samples from that room, including from the floor, the wall, and the bed. Bloody items of clothing, a pillow case, and the apparent weapon, the metal bar, were collected as well.

On September 9, 2010, Detective Jason Gates executed a search warrant of defendant's truck. A white trash bag with a red draw string was found in defendant's truck. The bag was significant because it was similar to the bag found over Hafen by police. Another white trash bag with a red drawstring, which contained clothing, was located inside the blue storage container in the back of defendant's truck. A shirt with blood spatter was found. The keys to Hafen's Lexus and his Toyota Tundra, his California driver's license, and his passport were found inside the cab of defendant's truck. A wallet containing credit cards belonging to Hafen, another photo I.D. for him, and Hafen's checkbook were found in the truck. An eviction notice evicting defendant from 760 Carmelita Drive, Hafen's home, was also found in defendant's truck. A note with the name Miriam and a telephone number, which at trial was confirmed to be Miriam Felix's telephone number, was found in defendant's truck. A receipt, dated August 27, 2010 and reflecting a time of 6:40 p.m., from El Charrito Market was also found in her truck. During questioning, defendant had told police that she had gone to the market. The receipt was significant because that was the last date anyone heard from Hafen.

*Autopsy*

On September 3, 2010, John Hain, a forensic pathologist, performed the autopsy of Hafen's body for the Monterey County Coroner's Office. Hafen was six feet tall and weighed 180 pounds. His body exhibited evidence of several days of decomposition.

Dr. Hain stated that the whole side of Hafen's temple was crushed and the skull was fractured and fragmented, by which Dr. Hain meant the bone was "broken apart into

4

pieces like a puzzle." The weapon had penetrated the skin, the hair, and the scalp to the skull. Both the temporal bone above the ear and the sphenoid bone immediately in front of the temporal bone were "fairly completely fragmented" on the right side. The fracture lines crossed through the right temporal bone and extended through the center of the base of the skull to the left temporal bone, causing a "hinge fracture" that extended completely through the skull and affected all the large blood vessels coming and going from the brain. The fracture lines continued from the left temporal bone into the right frontal bone as well. A broad area of bruising extended from the right side of Hafen's mouth area up to his right temple. There were gashes on his temple. There was a "puncture-type laceration" on the back of his head and the underlying skull was fractured.

Hafen's lower jaw was completely fractured in two places, which would have required "a very forceful impact." The soft tissue of his right cheek over the jaw was bruised. There were quite a few bruises to Hafen's tongue, which most likely occurred when Hafen bit it during the blows to his jaw.

Hafen also had an elongated bruise on his left upper arm. The bruise was very deep, which indicated that "something very forcefully struck that area." There was also a small bruise in the front of the left forearm. The back of Hafen's hand showed a large amount of bruising from the base of the thumb to the base of the index finger's knuckle. There were also lacerations or tears of the superficial skin, which Dr. Hain believed had occurred during the incident but he could not exclude the possibility that they had occurred after death. Dr. Hain found deep bruising in the areas of the index finger, the base of the thumb, and "the back of the base of the hand." These were not the type of injuries that would result from punching. When the hand is used in an offensive way, the injuries tend to be on the front of the knuckles. Dr. Hain believed Hafen's hand injuries were defensive.

Dr. Hain concluded that Hafen's cause of death was multiple blunt-force head injuries resulting from "bludgeoning" or "being struck with a hard, heavy, elongated,

5

blunt instrument." Hafen had been struck "extremely forcefully." Hafen's injuries were consistent with being struck with the metal bar, which was a very heavy instrument. In Dr. Hafen's opinion, the weapon most likely had been wielded like a sledgehammer.

In Dr. Hain's conservative opinion, it took at least about three blows to cause the injury to the skull, two consecutive blows to the right side of the temple and one blow to the left side of the jaw that fractured the left and right center jaw. The blow to the jaw was "certainly extremely forceful" with "some velocity behind it." If the "fairly devastating blow" to the jaw had occurred while Hafen was upright, it "would [have] probably take[n] him down" but the jaw fracture would not have been fatal. Dr. Hain stated that "[t]he defensive injuries could have been sustained during any of these three or more blows" or they could have been sustained during "a separate blow."

Blood and urine samples taken from Hafen were tested. Hafen had taken diazepam (Valium) and carisoprodol (Soma), a sleeping medication. Their levels indicated that Hafen had probably taken those medications more than 12 hours before his death. Lorazepam (Ativan) was present in Hafen's blood "at slightly higher than the therapeutic range," which suggested that he had taken that medication shortly before his death or he had taken a large amount at an earlier time. The level of lorazepam would not have caused unconsciousness. Diazepam and lorazepam are sedatives.

Hafen's blood also tested positive for opiate drugs but there was not "enough blood to quantitate them." Hafen's urine sample showed the presence of two components of Vicodin, namely hydrocone, which is the opiate portion, and hydromorphone. Hydrocone is a pain reliever.

None of the medications found in Hafen's system affect how a body bruises. The amount of alcohol found in Hafen's blood and urine could be totally explained by decomposition.

6

*Forensic Evidence*

The California Department of Justice's DNA laboratory analyzed items received from the Salinas Police Department. A cutting from an apparently bloodstained pillowcase and sample swabs from the floor, wall, bed, and an apparent bloodstain from the metal bar were tested for DNA. The sample swab from the floor produced a partial DNA profile consistent with Hafen's DNA profile. The cutting and other sample swabs produced DNA profiles completely matching Hafen's DNA profile. A "substrate control swab from the metal bar" produced "partial low level results" that, assuming only one contributor, excluded Hafen but not defendant.

Bruce Wiley, a criminal investigator for the Santa Clara County District Attorney's Office, testified regarding the bloodstain and spatter evidence. He discussed the blood on the headboard and the blood projected onto the wall above the headboard and the nightstand, the blood stains left by blood depositing on the eastern side of the mattress and bed sheet, rolling down the side of the bedrail, and dripping onto the carpet, and the bloodstains resulting from the large volume of "body fluids" that collected in, and poured out from, the plastic trash bag over Hafen's head.

Based upon the evidence, Wiley concluded that the victim was lying on his left side on the bed, facing the nightstand, and his head, the blood source, was on the top, right hand corner of the bed when he suffered "horrifically severe" wounds. The fact that all the blows were to the right side of Hafen's head and repeated in the same area is consistent with a conclusion that Hafen was on the bed and nonresponsive once the blood began to flow. The bloodstains were not consistent with Hafen being in a standing position at that point. The blood on the headboard indicates that Hafen's head was near the mattress's surface.

Wiley described the weapon as a very large, heavy length of rebar with a hexagonal head, like an "extremely large machine bolt," on one end. It weighed about 12 pounds and being struck with it was "the equivalent of being hit with a

sledgehammer." Wiley reconstructed that the attacker held the weapon with two hands and swung it from the left side of the bed.

*Defendant's Relationship with Defendant*

Santa Ana knew defendant. She described Hafen's and defendant's relationship as off and on over about six years. Hafen had broken up with defendant about 10 to 20 times. At the beginning of their relationship, defendant had her own contracting business but it failed. Defendant relied upon Hafen financially.

Hafen lived with defendant in his house on Carmelita Drive. Hafen and his nephew purchased a house in the Lake Don Pedro area of Mariposa County in about 2008 for the purpose of renovation and resale. For a period of time, Hafen lived with defendant in the Lake Don Pedro house while they were renovating it and he commuted to his Salinas office from Mariposa County.

Santa Ana helped Hafen prepare his request for a domestic violence prevention restraining order against defendant from the Mariposa County Superior Court. Santa Ana typed whatever Hafen dictated.

In his declaration, which reflected that it was executed on May 18, 2009, Hafen reported: "I have experienced many, many times, [defendant's] acts of violence towards me and my property." He stated that defendant "takes at least 3 prescription medications and is under the care of a psychiatrist for her anger and violent outbursts." Photos of Hafen's truck showing scratched paint and a broken light were attached to his declaration, which indicated those "acts were just an example of the acts of violence against [his] personal property."

Hafen also mentioned in his declaration that defendant had stolen his cell phone and stolen $5,200 by using one of his checks. The declaration stated that defendant had a misdemeanor conviction of brandishing a weapon. Hafen indicated that he allowed defendant to temporarily stay with him so long as she did not use drugs but she had "stayed longer than expected."

8

Hafen's declaration related an incident in which defendant was angry and swung a hammer at Hafen's head. It reported: "On Sunday, May 17, 2009, I attempted to have [defendant] help me with moving some of her clothing. She became violently angry. She took a hammer from the garage and threatened me with it." Hafen disclosed that defendant swung the hammer toward his head and, if he had not ducked, she would have hit him.

Hafen's declaration stated: "I have removed myself temporarily from my residence and I am now gravely concerned that [defendant] will commit continued acts of violence against my property. [She] could punch holes in the wall, throw property around and possibly break windows at my house." Hafen requested personal conduct orders, a stay-away order, and a move-out order.

Hafen's request along with his supporting declaration and exhibits were filed in superior court on May 20, 2009. Hafen gave a copy of the filed documents to defendant. Although Hafen had given the documents to the Mariposa County Sheriff's Department to serve upon defendant, the Sheriff's Department had not been able to serve her. At the hearing on Hafen's request, Hafen asked the matter to be dropped because of the lack of service and the court ordered the matter dropped without prejudice.

Hafen moved back to his Carmelita Drive house in December 2009. He tried to persuade defendant to leave his house. In 2010, Santa Ana helped Hafen prepare an unlawful detainer action against defendant to evict her from his house. It was filed in February 2010 but not prosecuted.

On Father's Day in 2010, Santa Ana received a call from defendant who asked for advice because Hafen was "out of it" and leaving the house in his bathrobe. Santa Ana talked to Hafen on the telephone; his words were slurred. Santa Ana told defendant to call an ambulance if something was wrong with him. Hafen was taken to the emergency room by ambulance. Hafen subsequently disclosed to Santa Ana that he was upset

9

because he believed defendant had poisoned him with PCP. Sometime in 2010, Hafen told Santa Ana that he was addicted to Ambien.

On June 28, 2010, Hafen filed a declaration for a default judgment in the previously filed unlawful detainer action and obtained a default judgment. A writ of possession was issued and a return on the writ of possession was executed on Thursday July 8, 2010; the writ was filed on July 15, 2010. Santa Ana gave the number of a locksmith to Hafen so that he could change the locks to his house. Hafen also paid for a storage unit for three months on behalf of defendant. Subsequently, there was about a two-week span when defendant did not come into or call Hafen's office.

Santa Ana recalled that, during their relationship, defendant called or came into Hafen's office to check up on Hafen all the time. Defendant was always jealous and trying to get information from Santa Ana about Hafen's contacts with other women.

Kristin Beber, who worked for Hafen as an office assistant from late 2008 until April 2010, knew defendant. Defendant often inquired, either by telephone or in person, about Hafen's whereabouts and his clients. Some days, defendant telephoned as many as 20 times. Defendant was jealous and she had a problem with anyone with whom Hafen had a relationship. Beber described Hafen as "very patient" and "one of the nicest people [she had] ever known."

In August 2010, Hafen confided to Santa Ana that he was afraid for his life and he told her that, if anything happened to him, defendant would be responsible. Hafen had told Santa Ana that defendant tried to poison him. Defendant never expressed to Santa Ana that she was afraid of Hafen. She never asked for help against abuse.

*Miriam Felix*

In about the early summer of 2010, Miriam Felix retained Hafen as her divorce attorney. At some point, Hafen told Felix that he wanted to date her. Hafen hired Felix as his housekeeper; she needed money to support her three children and herself.

10

Felix cleaned Hafen's house three times a week and sometimes she brought her 13½-year-old daughter to help.

After hiring her, the first thing Hafen asked Felix to do was pack up defendant's belongings because defendant was moving out of his house. Hafen said that defendant stayed at his home on weekends because she did not have another place to go and she did not get along with her own family. Hafen told Felix that he was scared of defendant, defendant broke things, and she had given him "elephant tranquilizers." While cleaning Hafen's house during the weekdays, Felix saw things that were broken, "like holes in the wall, the TV, the computer." Hafen told Felix that defendant was responsible. Hafen told Feliz that defendant was really violent and defendant needed her medication.

An eviction notice, which Hafen called a restraining order, was posted on the door of the coat closet next to the front entry. Hafen told Felix that he was "really scared" of her. He was afraid "[h]e was going to get hurt." Hafen put locks on the windows and the front door for his own protection; he screwed shut the sliding glass door to the backyard. Hafen instructed Felix to call the police if defendant came over during the day because she was "really violent" and she was not supposed to be there.

Felix received threatening late night calls from defendant in about July 2010. Defendant did not disclose her name during those calls but Felix recognized defendant's voice because Felix and defendant had both been at Hafen's office at the same time and defendant had a distinctive voice. Defendant knew Felix was getting divorced and where Felix had been born and raised. Felix did not know how defendant had obtained that information. Defendant said that it was not fair that Felix was taking away her man. She said if Felix did not stop, Felix would regret it. She said that Felix was "going to pay" for what she was doing. Defendant threatened to hurt Felix; Felix believed this threat because Felix thought defendant was unstable. Felix said she told her daughter about the calls.

During August 2010, Felix saw defendant a few times when she was arriving at Hafen's house while defendant was leaving. Defendant called her names, such as "[t]he 'B' word." She thought the name-calling had occurred in front of her daughter.

On about the Friday or weekend before Hafen's body was discovered, Felix went to Hafen's house to collect her pay for cleaning his house. Felix knocked on the kitchen window and defendant, who was inside, started to scream at her. She was yelling something like "get the fuck away from" "my house." Defendant called Felix a "bitch." Defendant indicated Hafen was sick. Defendant was "yelling all kind of crazy stuff."

Felix, who had a remote control for Hafen's garage door, subsequently returned to Hafen's house on Monday morning to clean and entered the house through the garage door. Felix became very scared because, when she entered, the house smelled really bad and it was very hot inside. She saw defendant's belongings but she did not see defendant. She got out as fast as she could; she thought she was going to throw up because of the horrible smell.

*Defendant's Conduct On and Around August 27, 2010*

Bernice Dias lived directly across from Hafen on Carmelita Drive. Sometime in August, Dias allowed defendant to park her pickup truck in Dias's driveway and store her clothing, a bag of tennis supplies, a toolbox, and her jewelry in Dias's garage. In August 2010, defendant told Dias that she suspected Hafen had a new girlfriend. Defendant also mentioned Hafen had a housekeeper and asked whether Dias had seen somebody going in and out of Hafen's house.

A day or two before August 27, 2010, defendant visited the home of Steve Buhler, Hafen's next-door neighbor on Carmelita Drive. Defendant griped to Buhler about Hafen's new girlfriend.

Santa Ana indicated that defendant came into Hafen's office a little bit after 8:00 a.m. on the morning of Friday August 27, 2010. Defendant was mad because she found out that Hafen had "a new lady in his life." Defendant told Santa Ana that she had

12

spent the previous night at Hafen's house and Felix had come by Hafen's house that morning. Defendant asked Santa Ana to speak to Hafen on her behalf and to tell Hafen that she was a good person and she was good for him. Defendant left and returned to Hafen's office multiple times that morning.

On August 27, 2010, at about 10:00 or 11:00 a.m. defendant showed up at Buhler's door. Buhler's son, who was then about 16 or 17, had plans to play golf with Hafen in the afternoon. Defendant was looking for Hafen and she was "very irate and upset" because Hafen was going golfing without her and because Hafen had a girlfriend. Defendant asked Buhler how Hafen could have a new girlfriend after the years they had been together and defendant said she was not going to tolerate it.

At some point that morning, Hafen, who was in and out of the office, had a confrontation with defendant; he asked defendant to leave and threatened to call the police if she did not. When Santa Ana was leaving Hafen's office a little bit after 12:00 p.m., defendant was still there and Hafen was in a consultation in his office so Santa Ana took defendant to the parking lot behind the office. When Santa Ana left, defendant was in her truck. Hafen called Santa Ana a little bit after 1:00 p.m. on Friday afternoon; this call was the last time Santa Ana heard from Hafen.

Before Hafen and Buhler's son left to play golf, Buhler was in his garage and he heard defendant and Hafen arguing very loudly; he went to see what was happening. Defendant was screaming at Hafen. Buhler did not want his son in the middle of it but Hafen reassured Buhler that everything was fine. After Hafen and Buhler's son were in Hafen's Toyota Tundra truck, defendant began yelling through the open driver's window. Defendant yelled that she needed to get into the house to get more stuff. She wanted the garage door opener to Hafen's house and she seemed angry. Hafen appeared to not want to give the opener to her but he did. Hafen drove away and defendant also left.

On the way to the golf course, Hafen told Buhler's son that he did not want defendant living there anymore and he mentioned he had met a younger woman in whom

13

he was very interested. At some point, Hafen had said he felt bad about defendant's living situation because he believed that she did not have somewhere else to stay.

Buhler briefly spoke to Hafen at about 9:00 p.m. on Friday evening when Hafen came out of his house while Buhler was watering his front yard. Hafen, who was wearing "boxing briefs," apologized for being in his underwear. Buhler did not see Hafen again.

Neighbors saw defendant go into or out of Hafen's house over the weekend of August 28, 2010 through August 29, 2010. Dias believed she last saw defendant that Sunday night.

On that occasion, defendant knocked on Dias's door at about 8:00 p.m. Defendant's truck was parked in front of Dias's house. Defendant claimed that she had been trapped in Hafen's house, Hafen had nailed the windows and doors shut, Hafen had tried to drug her, and, now that he was asleep, she was leaving. Defendant did not indicate she felt ill or wanted to go to the hospital.

Peter Andresen lived on Carmelita Drive and he generally spoke to Hafen at least once a week. Andresen also knew defendant and saw her in the neighborhood. The last time Andresen saw defendant was at about 11:00 a.m. on Monday August 30, 2010. She was sitting in a truck, which was parked near Hafen's house on the opposite side of the street. Andresen was driving by and pulled over to talk to her. About two or three weeks earlier, Hafen had spoken to Andresen, who was the head of the local Neighborhood Watch, about getting security cameras. Hafen indicated somebody was getting into his house and he thought the intruder might be defendant.

Andresen saw a bag of golf clubs in the back of the truck. Defendant got out and walked up to Andresen's car window. She said something like, "Mark's not going to be able to play golf anymore because I have his golf clubs." She was unusually subdued; she seemed "very medicated." She said "that son of a bitch has another girlfriend and she's a client and he's going to get what he deserves."

14

After dark on Monday, August 30, 2010, defendant arrived at the home of her mother, Mary Garza. Defendant had called earlier to tell Garza that she was leaving and she wanted to see Garza and say goodbye. Defendant was very emotional when she arrived. Garza was on the telephone with the Crisis Center, which she had called because she was so worried about defendant. Garza was trying to calm defendant; defendant indicated she felt sick to her stomach and was trying to throw up. On Monday night, Garza wanted to take defendant to the hospital but defendant refused to go.

Defendant slept most of Tuesday at Garza's home. Defendant did not want to eat and she hardly talked. She spent the majority of Wednesday sleeping on the sofa. Defendant was still at her mother's home on Thursday but she did not tell her mother anything.

On Thursday, Garza's daughter, Teresa, called Garza and told her that Hafen had died. When Garza asked defendant what had happened, defendant said Hafen and she had been fighting. Defendant claimed that Hafen cornered her against the wall, she pushed him away, and he fell on the bed. She told her mother that, when Hafen tried to get up and come after her again, she grabbed a bar from him. Defendant hit Hafen, he fell onto the bed, and she ran out of the room.

Garza and Teresa took defendant to the police station.

*Neighbors*

Andresen moved to Carmelita Drive in 2007 and defendant had visited his house four or five times to see his baby daughter. Defendant had spoken very pejoratively about Hafen. She would get very angry about Hafen, she "felt very wronged," and she had called him a "bastard, son of a bitch, [and] asshole." Defendant never said that she was abused by or afraid of Hafen.

When Andresen mentioned to Hafen that defendant visited his home, Hafen asked something like, "Can you handle it?" Andresen understood Hafen to be asking whether Andresen needed Hafen to do something to prevent defendant from going to Andresen's

15

house.  Andresen had never seen Hafen get angry.  Andresen described Hafen as "pretty mellow" and "pretty laid back."  When Andresen had consulted Hafen about a child custody dispute, Hafen had been "a real peacemaker."

Anne Buhler, who was Hafen's neighbor for about a year and a half, often conversed with defendant near the driveway since their vehicles were parked about three feet apart.  Defendant had never told Anne that she was afraid of Hafen.

*Domestic Violence Against Men*

Eugene Porter, a licensed marriage and family therapist, testified regarding domestic violence against men and intimate partner battering.  In his experience with male victims, Porter found those victims sometimes feel very ashamed to have been battered by a woman and believe that other people will see them as weak and unmanly.  Male victims of battering often have difficulty leaving the dysfunctional relationship because of low self-esteem and poor internal resources; they may feel the abuse is somehow their fault.  A male victim with a responsible job may fear losing status and the respect of the community if he tells others about the problem.  Male victims often go back to the abuser because they want to make peace and fix the relationship; they still have the need to take care of or provide for their partners.

*Prior Domestic Violence*

Randy Wilson, who met defendant in about 2004, had an on-again-off-again dating relationship with defendant for about a year.  He described her as "almost like Jekyll and Hyde."  Defendant became jealous if he talked to another woman; defendant checked his telephone to see if he had been talking to other women.  Defendant had threatened to kill Wilson if there was another woman.

When Wilson was trying to terminate their relationship, defendant came into his shop and attempted to get him to take her back.  When Wilson left the shop and drove away, defendant followed him in her vehicle.  He pulled into a truck stop and she pulled

16

in front of him and blocked him in. Wilson told defendant to leave him alone. Defendant falsely reported to police that Wilson had brandished a firearm at the truck stop.

At about 7:00 p.m. on March 25, 2005, Ian Parsons, who works for the Salinas Police Department, was dispatched to investigate a 911 report from defendant that Wilson had waved a gun around. The officer spoke with Wilson at his home. When the officer subsequently spoke with defendant by telephone, he asked her at least three times for a description of the gun but defendant was concerned about keeping a cell phone being paid for by Wilson. Defendant was unable to describe the gun. Officer Parsons did not believe her account and refused her request for an emergency protective order.

During a period while Wilson and defendant were dating, Wilson went to the State of Washington on a work-related trip. Defendant followed him there even though Wilson did not want her along. After she reached him, Wilson did initially give her some work but he eventually threatened to change hotels if she did not leave. While they were in Washington, defendant stole his house keys and then, without his permission, she moved into his home. After Wilson returned home, Wilson allowed defendant to stay for the week while he surreptitiously arranged for a locksmith to change the locks. When defendant discovered she had been locked out, she threatened to kill Wilson.

On September 24, 2005, when defendant came to Wilson's house to pick up her things, Wilson made her sign an itemized list of her belongings in duplicate. When defendant took both copies of the list, Wilson jumped up and shut the door to prevent her from leaving; the door accidently hit defendant's wrist. Wilson apologized and offered to take her to the emergency room but defendant said she was fine.

John Richardson, who worked for the Salinas Police Department, was on duty on September 25, 2005. He was called to the Natividad Medical Center where he met with defendant, whose right hand and wrist were being examined. Wilson was arrested and detained at the police station. When questioned, defendant did not deny that Wilson had apologized and she did not explain why it took her so long to get to the hospital.

17

Although defendant wanted Wilson prosecuted for domestic violence, Officer Richardson ultimately determined the incident was most likely an accident. Wilson was not prosecuted.

Subsequently, Wilson sought a restraining order against defendant because she would not leave him alone. She continued to drive by his house and business at different times, and Wilson was afraid for the safety of his son, who was then six or seven years old. Defendant stipulated to stay-away and no-contact orders, which were filed December 15, 2005.[2] Defendant still came by a couple of times after the order but Wilson told her she was not welcome and there was a restraining order.

Gordon LeGault was in a relationship with defendant from about 1999 through about 2002 or 2003. They lived together. Their relationship was volatile and off and on. When they argued while in defendant's car, she pulled over and made him get out. Sometimes she came back for him and sometimes she did not. LeGault described defendant as Jekyll and Hyde.

During an argument after a split-up, defendant had a knife and she was trying to stop LeGault from leaving his house. LeGault received a little cut, which left a little scar.

Defendant twice slashed the tires on LeGault's truck. The first tire slashing incident occurred after they had split up and defendant came into the Outback, where she discovered him talking to some girls. When he went to the truck, he found all four tires had been slashed. When LeGault threatened to call police, defendant said that she would buy him new tires, which she did.

One evening, after their relationship was over and LeGault was living at his mother's house, defendant came to the house and they argued. When he went outside, LaGault found his truck's tires slashed again. He threatened to call the police; defendant once again bought new tires.

---

[2]    Hafen represented defendant in the restraining order matter.

18

Defendant made lots of threats during their relationship and was verbally abusive. Defendant threatened to kill LeGault more than once. She threatened to kill him if he left her for another girl. She said he was dead if she found him with somebody else. Defendant accused him of being unfaithful even though he never was unfaithful.

LeGault tried to end their relationship many times and defendant talked him into coming back. He finally moved back to his mother's house but defendant continued to call or come over and crawl through a window. LeGault sought a restraining order against defendant. His declaration in support of the restraining order indicated that defendant went into "rages of anger." On October 24, 2001, a court issued a domestic violence prevention order to show cause (OSC); defendant was personally served. Defendant told LeGault that her license would be in jeopardy if there was a restraining order against her and assured him that she would stay away from him. LeGault did not complete the process, and the matter was dropped when neither LeGault or defendant appeared at the OSC hearing.

B. *Defense Case*

Dr. James Farrow, a staff physician employed part-time by Harden Medical Care, treated Hafen as a patient for the first time on April 7, 2010. At that time, Hafen complained of insomnia and was seeking Ambien. Hafen indicated that he had been on Ambien for some time. Dr. Farrow recorded his belief that Hafen had a history of Ambien addiction.

John Bohannan, a licensed private investigator, had known defendant "[p]robably close to 20 years" at the time of trial. In about June 2010, defendant telephoned Bohannan for help; she wanted to show him some bruises on her body allegedly caused by Hafen. Bohannan refused to get involved. He did not want defendant interfering with his current relationship.

In 1994, while defendant and Bohannan were in a dating relationship, defendant called the police on him. She accused him of intentionally closing her hand in a door and

19

he was arrested for domestic violence. He had not closed her hand in a car door. During their relationship, defendant had been jealous of other women, for example his ex-wife. Even after their relationship was over, defendant "laid claim" to him by visiting him in his office and asking his new girlfriend "what she was doing talking to her boyfriend."

Dr. Elpidio Resendez, a physician who at the time of trial had worked in the emergency department of Salinas Valley Memorial Hospital for 16 years, saw Hafen in the emergency room (ER) at about 8:00 p.m. on June 20, 2010. Hafen arrived by ambulance and the initial information was obtained from the paramedics, who had obtained it from Hafen's fiancée. The fiancée had indicated to them that Hafen was on clonazepam and trazodone. The fiancée did not come to the hospital or pick Hafen up from the hospital.

Hafen told Dr. Resendez he took four medications: clonazepam, trazodone, Seroquel, and Ambien. He stated that he had never taken two of those medications at the same time. Hafen did not tell the doctor that he thought he had been poisoned or someone had given him PCP. Hafen seemed upset but not angry that he was in the ER. A urine test confirmed clonazepam. The toxicology screen did not, however, test for all the prescription medications. Although the screen was negative for PCP, Dr. Resendez did not know whether PCP was soluble in water.

Dr. Resendez concluded that Hafen had taken two medications that did not mix well and his final diagnosis was "confusion probably secondary to medications." The doctor called the fiancée and gave her instructions for Hafen to go to his regular doctor. Hafen returned home that night by taxi. Dr. Resendez was not aware that Hafen had requested an amendment of his medical chart.

On July 8, 2010, Cherie Somavia, a police officer with the Gilroy Police Department, responded to a report of assault. Officer Somavia spoke with defendant, the alleged victim, and the officer looked at defendant's hand but she did not see any injury. The officer nevertheless obtained a five-day emergency protective order for defendant.

20

Dr. James Hoffman, a family practice physician employed by Salinas Family Practice saw Hafen as a patient on July 12, 2010. Hafen had been seen as a patient in the practice since 1983 and he was first seen by Dr. Hoffman in 1994. Hafen reported that "somebody had poisoned his food" and he had been seen in the ER. Hafen indicated that he was having difficulty sleeping and feeling a little confused for the past two days. Dr. Hoffman gave Hafen a prescription for 10 Ambien CR (controlled release) pills.

During the summer of 2010, Felix's daughter occasionally helped her mother clean Hafen's house. The daughter recalled seeing defendant only one time when they arrived in the morning to clean Hafen's house. They found defendant and Hafen verbally fighting with raised voices. The daughter did not remember defendant calling her mother a "bitch" or any other names or "flip[ping] [her] mother off" as defendant was leaving. Felix's daughter, who at the time of trial lived with her father, said that Felix never told her that Felix was getting midnight telephone calls from defendant.

Defendant's mother, Garza, indicated that, after defendant became involved with Hafen, defendant participated even less in family functions. Garza and defendant had been "a little bit estranged" during the past six or seven years. In July and August of 2010, Garza thought defendant was living with Hafen.

Defendant testified in her own behalf. In about 2004, she retained Hafen to help her terminate her marriage to Jeffery Lee Gross, Jr. Hafen also represented her in a chapter 7 bankruptcy proceeding and in a chapter 13 reorganization of her contracting business. Defendant had been a California licensed contractor. Hafen and defendant became romantically involved in about 2005 and she moved in with Hafen in about 2006.

Defendant attempted to paint Hafen as an abusive person. She insinuated that in February of 2005, after an attorney-client meeting, lunch, and drinks with Hafen, Hafen had taken sexual advantage of her and she had awoken on his office floor with her pants down around her ankles. In 2007, after they were living together, Hafen became annoyed with defendant for socializing with other men at a July Fourth barbecue. Hafen later told

21

her, in a sarcastic voice, to not "flaunt" herself. In the summer of 2007, after Hafen became "very, very livid" that defendant went on a motorcycle ride with another man, she temporarily moved out for about a month. Defendant claimed that, on one occasion, Hafen had raped and sodomized her while she was sleeping after she had taken Ambien. Hafen was moody and yelled at her "just about everyday [*sic*]."

During late November or the holidays of 2007, Hafen and she moved to the Carmelita house. At some point, defendant began to help Hafen renovate a house in Lake Don Pedro in Mariposa County even though her contractor's license was inactive. At some point, defendant worked on the house throughout the week and Hafen came on the weekends. In December 2008, they began living together in the Lake Don Pedro house fulltime and Hafen commuted to work. She claimed that Hafen became more irritable and more controlling of her.

According to defendant, Hafen was physically violent with her around 30 times in the Lake Don Pedro house. She testified that Hafen dragged her by her hair, slapped her, hit her, threw things at her, and forcibly had sex with her and she sustained bruises and welts. She sustained facial bruises multiple times but she did not tell anyone because she was afraid Hafen would hit her. Hafen threatened to evict her and threatened to get a restraining order against her multiple times.

Defendant denied being aware that, in 2008, Hafen was actually trying to get a restraining order against her and denied receiving a copy of such an order from Hafen. She denied that Hafen asked her to move out of the Lake Don Pedro house but she acknowledged that two officers from the sheriff's office instructed her to immediately leave the premises and she was escorted out. She indicated that Hafen said they had a court date and mentioned "something about a hammer and an argument." She indicated that she attended the court hearing but Hafen dropped the case.

In the latter part of 2009, they left the Lake Don Pedro house and moved back to the house on Carmelita. According to defendant, in about early 2010, Hafen took

22

"Vicodin and OxyContin and Norcos for his pain" when he played tennis, which resulted in mood swings. Hafen became angry and violent and he began hitting defendant again.

Defendant testified that, although Hafen had threatened to evict her, she did not know that Hafen had prepared the eviction paperwork in February 2010. In about May or June 2010, Hafen was still hitting her but the frequency had "tapered down" and they were getting ready to go to Panama, where Hafen had built a home for himself.

According to defendant, while in Panama, Hafen took medication and became paranoid. Hafen and she got into a physical altercation. When defendant came out of the shower, Hafen grabbed her and threw her. Her right buttock hit a "tile corner" and she sustained a bruise that was about a foot by four inches in size. One night in Panama, Hafen left her at a restaurant where they had driven for dinner and she had to walk a couple of miles by herself to get home. She had bruises on her face from Hafen hitting her with the back of his hand. Defendant's prescription medications were running out before they were due for refill. Defendant wondered whether Hafen's behavior was the result of him taking her medications, which she said had been his pattern for a long time. She was taking Lorazepam, clonazepam, Ambien (zolpidem), and Soma.

When defendant returned from Panama, she continued to stay with Hafen. She was not working and was financially dependent on Hafen. Defendant tried to show her bruise to Bohannan.

Defendant described what happened on Father's Day in 2010. Hafen, who had taken something so he could sleep, began retrieving suitcases and said he had to get ready to move. Hafen was staggering and stumbling and trying to shove things into his truck. When defendant called a neighbor over, Hafen started walking down the street and looking in trash cans. After defendant spoke with Santa Ana, defendant called an ambulance and the paramedics arrived. She showed them Hafen's prescription bottles and then Hafen was taken to the hospital. When he returned from the hospital, defendant was asleep. The next day, Hafen was livid because defendant had called the paramedics.

23

After the Father's Day incident, Hafen began eviction proceedings and served her with an eviction notice. Defendant was required to be out of Hafen's house by 2:00 p.m. on July 8, 2010.

On July 8, 2010, Hafen and defendant went to the Gilroy DMV to take care of defendant's speeding ticket. Hafen was irritable and impatient and they left. Hafen got into his truck, which was parked close to defendant's truck, and took off as defendant opened the door to her truck. Defendant's finger was caught between Hafen's truck and her truck door and she screamed in pain. Fire department paramedics, who were in a vehicle parked behind defendant, called the Gilroy Police Department and a female officer responded. Defendant complained that Hafen had injured her finger. A restraining order was issued against Hafen.

Around July 22, 2010, defendant telephoned Hafen because her DMV registration and her insurance were due, she needed to renew her license, and she wanted to pick up her things. Hafen told her that her belongings had been packed up and placed in storage. Hafen told her that she could not show up at his house without permission. Defendant stayed the weekend with Hafen and then went to her aunt's house. The following weekend they went to Mexico together. Defendant stated that Hafen and she went to Mexico every other weekend and she stayed with Hafen every other weekend.

Defendant claimed that she never saw Felix at Hafen's house before the weekend of August 27, 2010. She did not remember being at Hafen's house in the morning when Felix showed up with her daughter to clean the house. Defendant acknowledged speaking to Felix on the telephone and offering her a safe place to stay but defendant indicated that exchange occurred when Felix called Hafen. Defendant denied telling Jim Dozier that Felix was drugging Hafen.

Defendant did not call Hafen's office for about two weeks after her eviction. She conceded that, after about two weeks, she began to call again but she could not remember how many times she called during August 2010. Defendant conceded that, at times, she

24

had made lots of telephone calls to Hafen's office. She called the office for Hafen's weekly schedule but she explained that was so she could have Hafen's suits ready for court.

Defendant spent the night at Hafen's house on August 26, 2010. According to defendant, Hafen forced her to have sex. On the morning of August 27, 2010, Hafen was rushing defendant out of the house because he was expecting his housecleaner. When Felix drove up, defendant recognized her vehicle.

Defendant denied that she spoke to Buhler on August 27, 2010 about Hafen's new girlfriend; she said they talked about golf clubs. Defendant claimed that after she left Hafen's house, she saw Andresen in his vehicle and he flagged her over. She had Hafen's golf clubs in the back of her truck and, according to her, she told Andresen that she was getting the clubs ready for Hafen, who was golfing that afternoon.

Next, defendant tried to go to her storage unit but she could not get in using the key pad and called Hafen's office to get the code. She admitted that she went to Hafen's office three or four times that day.

Defendant denied speaking to Santa Ana or anyone else in the office about a new lady in Hafen's life. Defendant denied that Hafen had told her that he was dating Felix or that she was beginning to suspect that they were dating. When asked about her comment to Detective Knowlton about Hafen and Felix having sex in his spare bedroom, defendant indicated Hafen had been joking.

Defendant denied having an argument with Hafen before he went golfing. She said that Hafen was irritable because he had taken Vicodin. According to defendant, Hafen wanted her to make dinner and she needed the garage remote control to get in his house. She denied that they argued about the remote control.

Defendant picked up food to make dinner. Hafen returned home just before 7:00 p.m. They went out and picked up a six-pack of Corona. They ate dinner, Hafen showered, and they watched television. They went to sleep in the same bed in the master

25

bedroom; Hafen was naked. Sometime later, Hafen got up, put on boxer shorts and a sweatshirt and went back to bed.

According to defendant, the next thing she knew, Hafen was dragging her out of the bed by her arm. Hafen slammed her against the wall and was yelling at her about calling "the paramedics on him." He hit the side of her head with his open hand and used foul language. Hafen grabbed the bar, which he kept in the master bedroom for protection, shoved it against her, and pinned her upper body. While holding the bar, Hafen hit her in the jaw and forehead with his closed fist. He hit her in left and right temples. Hafen was in a rage and hitting her. He put down the bar and continued screaming and hitting her. He got the bar again and held it against her and called her a "stupid fucking whore." He put the bar down by the bed but he was still "pissed." He was sitting on the edge of the bed and still yelling at her.

Defendant grabbed the bar and hit Hafen because she did not want him to hit her; he went down. Defendant thought she hit Hafen two or three times. Defendant rolled off the bed onto the floor. Defendant claimed that the bar fell out of her hands and hit Hafen's jaw. She obtained a plastic bag from the bathroom and "poked it under his head" because she did not want to get the carpet dirty.

Defendant claimed that she did not think he was dead. Defendant maintained that she did not intend to kill Hafen; she intended only to stop him from hitting her. She shoved the blankets off the bed onto Hafen and passed out on the bed. She did not know how the blankets came to be wrapped around him.

Defendant testified that when she got up on Saturday morning, she made coffee for Hafen. She believed he was sleeping. Around 5:00 or 6:00 a.m., she drove defendant's truck to Rotten Robbie's and filled it with fuel. She did not disturb Hafen or go into the master bedroom during the day. She took a bath and got dressed. On Saturday night, defendant slept on the bed in the master bedroom. When asked whether she checked on Hafen, defendant stated that "[h]e was still sleeping."

26

When defendant awoke on Sunday morning, she went into the living room and lay on the couch. At times, she thought she heard Hafen. She went into the master bedroom to get her Uggs; she thought he was still sleeping.~ RT 1035)~ She unplugged the refrigerator because its icemaker was making noise in order to hear Hafen. On Sunday night, she took a bath, put on her pajamas, and went to bed in the master bedroom. According to defendant, Hafen was sleeping on the floor.

Defendant woke up on Monday and she later fell asleep on the couch. According to defendant, she heard the housekeeper calling for Hafen at the kitchen window. She told Felix that Hafen was sleeping, he did not feel well, and he did not want to be disturbed. Felix indicated that she had come for her pay; defendant told her to talk to Santa Ana. Defendant denied telling her to "Get the fuck out of my house." After Felix left, defendant went back to the couch and took a nap.

At some point on Monday, defendant called her mother. As it was getting dark, she got into her truck and left Hafen's house through the garage. She went across the street to Dias's house. She claimed that she did not say anything to Dias about herself and Hafen. According to defendant, when she left the house on Monday, she believed that Hafen was still sleeping and she did not know he was dead.

On Monday evening, defendant went to her mother's house, where she stayed until Thursday. On Thursday, after defendant's sister, Teresa Picazo, and defendant's mother talked on the telephone, defendant's mother questioned defendant about Hafen. Her mother said that Hafen was dead and the police were looking for her. Defendant told her mother that Hafen was sleeping when she left. Defendant's mother and sister took her to the police station.

Defendant testified at length regarding prior relationships and her own victimization. Defendant admitted, however, that she made police reports concerning the men with whom she had been in a relationship during or after their breakups.

27

On April 25, 1994, she called the police after Bohannan slammed a car door as she was trying to leave and her hand was caught in the door. She acknowledged that, although Bohannan was arrested, he was not prosecuted.

Defendant could not remember calling LeGault about a restraining order or promising to leave him alone if he dropped his request for such order. A proof of service showed that defendant was personally served with an order to show cause as to the restraining order on October 25, 2001.

As to LeGault's testimony that she had cut him with a knife, she claimed that she never approached him with a knife or cut his arm. Defendant denied slashing LeGault's tires when he was living at his mother's home but defendant acknowledged that she did offer to replace them. She could not remember a second tire slashing incident or buying tires for him another time. Defendant denied that she had ever threatened to kill LeGault or climbed in a window in his mother's house.

On May 10, 2003, defendant reported to police that her husband had strangled her. Although she initially claimed that Gross was arrested and prosecuted and he served a year in county jail, defendant acknowledged that Gross had been prosecuted for two separate incidents, one work-related, and the court record showed that he served only one day in jail on the domestic violence charge. When Gross was released from jail, defendant picked him up and he returned to her home.[3]

While Gross was incarcerated, defendant became involved with Wilson. As to the March 2005 incident testified to by Wilson, defendant denied that she chased him in her truck; she claimed he followed her. She maintained that he had brandished a gun.

Defendant denied pursuing Wilson to Washington. She claimed that Wilson had included her in a work project in Washington. According to defendant, she returned to Salinas without Wilson because she had been bitten by a spider. She acknowledged that

---

[3]     Hafen helped her to legally end that relationship.

she used Wilson's key, which she said he had given to her five months earlier, to temporarily live in his Salinas house. On August 4, 2005, defendant called police because Wilson locked her out "for no reason."

Defendant acknowledged that there was "[s]ome degree" of truth to Wilson's account of her harassing and annoying him and repeatedly coming in and going out of his life. She acknowledged that she contacted Wilson about three times a week but her explanation was that Wilson was refusing to pay her for her part of the Washington job. She claimed that Wilson was emotionally abusive.

In September 2005, defendant went to the hospital because of a wrist injury.[4] The previous day, Wilson had slammed the door of his house on defendant while he was trying to prevent her from leaving. According to defendant, Wilson had forced her to sign a paper in which he lied about her property and she was taking the paper. Defendant claimed that she did not call the police because Wilson threatened to report that she had broken into his house. Defendant conceded that she signed a stipulation to stay away from Wilson and his son and to not have telephone, e-mail or mail contact with them.

Defendant admitted that she had a criminal record and, in 2001, she pleaded to the misdemeanor offense of brandishing based on her brandishing of a weapon at a former employee, Shawn Mares, whom she had terminated. According to defendant, Mares went to a lake with her and others during Memorial Day weekend and Mares took off with her jet ski and he did not return. Defendant claimed that Mares later left threatening messages at her office and she made a police report against him. Subsequently, when defendant went to pick up another employee who lived with Mares, Mares pushed her. Mares "got mad" because defendant had "left him at the lake" "with nothing but his bathing suit on" and he was yelling at her. She grabbed a golf club out of the back of her truck and hit Mares on the arm.

---

[4]     Hafen took defendant to the hospital.

29

Defendant had been on prescription medication for almost 20 years and she had seen Dr. Sadler for years. She indicated that she takes "p[s]ych meds" to calm her nerves. If she does not take her medications, she becomes very anxious and agitated. At trial, defendant admitted taking medications that she had obtained in Mexico. Defendant could not recall telling a deputy sheriff on September 3rd that if she did not get her medication, she would be "real creative on how to kill" herself.

Defendant admitted that Hafen had bought her a truck. He paid for all her medications.

Linda Barnard, a licensed marriage and family therapist specializing in intimate partner battering, evaluated defendant at the county jail. Defendant reported a "history . . . of being a victim of domestic violence in multiple intimate relationships" and defendant "described several instances of physical and psychological abuse" by Hafen. Defendant described an incident in Panama in which Hafen had thrown defendant across the room and physically abused her. Barnard also reviewed the police reports, the autopsy report, psychiatric reports, and psychiatric records from the county jail. In Barnard's opinion, defendant was a battered woman.

Barnard indicated that a battered woman is most often the best predictor of future abuse by her partner and she has the best sense of what might be a trigger. Leaving a relationship is statistically the most dangerous time for battered women.

Barnard also explained that a dissociative psychological state may occur when a person experiences something that is so emotionally overwhelming that they disassociate from their feelings. A person in a dissociative state may suffer from dissociative amnesia and not remember what happened because memories were not laid down. In Barnard's view, defendant's apparent belief that Hafen was sleeping in the days after she hit him and her normal activities epitomized the dissociative state, which is a way of coping with a traumatic event by blocking it out and trying to make a normal life.

30

Barnard acknowledged if she disregarded everything said by defendant, she would not have been able to render an opinion.

C. *Prosecution's Rebuttal Case*

James Knowlton, a detective for the Salinas Police Department, was assigned to investigate a suspicious death that had occurred at 760 Carmelita Drive, Salinas. Knowlton and his partner went to that location and examined the scene. There was a very strong odor, like something had died a long time ago, emanating from the house. He observed a bowl of what appeared to be liquid air freshener, later determined to be a cleaning and deodorizing product, on top of the dresser in the bedroom where Hafen's body was found.

On September 2, 2010, a person, later identified as defendant, came into the Salinas Police Department. She said that she wanted to turn herself in and speak to a homicide detective.

Detective Knowlton interviewed defendant. Defendant said she had heard about Hafen's death from her sister. Later, when the detective indicated Hafen was deceased, defendant became upset and an ambulance was called; defendant pretended to have passed out when the paramedics arrived. The interview was continued in the hospital. The next day, Detective Knowlton interviewed defendant in jail.

During the initial interview, defendant indicated that Hafen was her fiancé and they had been together for almost six years. Defendant stated that Hafen and she had been together over the weekend and she had left the house on Monday. Defendant inconsistently indicated that Hafen and she had separated during the previous July. She stated that Hafen allowed her to stay with him about half the time and she showered and did her laundry at his house.

Defendant told Detective Knowlton that, on the previous Friday morning, Hafen wanted defendant out of the house by a certain time because he had a woman coming over to clean the house, Felix. Hafen had indicated that Felix and he were seeing each

31

other.  Hafen was upset because Felix had seen defendant.  Defendant left Hafen's house and drove around.  She then went to Hafen's office to wait for him.

Later on Friday, defendant picked up some "carnitas meat" and, after Hafen returned from playing golf, defendant cooked dinner for him.  Defendant and Hafen went to sleep on Friday night.

Defendant told Detective Knowlton that Hafen awoke when it was still dark and he was mad and irritable.  She tried to calm Hafen down and told him that he was taking "all these medications and . . . all freaked out right now. . . ."  Hafen put on a sweatshirt; he was trying to get dressed and leave.  Hafen grabbed her arm, which resulted in a bruise, and grabbed her by the throat.  According to defendant, Hafen said, "I hate you!  I hate you!  Why [are] you doing this to me?"  She claimed that she got a mark on her eye when Hafen shoved her.  Hafen was trying to leave the room but defendant told him that she would not let him out of the house.  They were both standing up and Hafen had defendant against the wall by the door.  According to defendant, Hafen was raging and he had some kind of metal object against her and he was pushing her against the wall.  She did not think about calling the police because she did not want to get him in trouble and she wanted to help him with his drug issues.

Defendant told the detective that they both took medications to sleep.  When she woke up on Saturday morning, defendant was on the floor in the bedroom.  Defendant got up; she was nauseous and she did not feel good.  Hafen never came out of the bedroom on Saturday.  She did not check on Hafen.  At some point on Saturday, defendant grabbed Hafen's wallet and the keys to his truck, which was on the driveway, she went to Rotten Robbies on Main Street, she got gas with Hafen's debit card, she drove around town for awhile, and she eventually went back to Hafen's house.  She felt extremely sick to her stomach; she laid down on the couch and fell asleep.  Defendant indicated that she never went back into the bedroom on Saturday or Sunday.  Defendant said that she was just letting Hafen sleep.

32

On Sunday, Felix pounded on the open kitchen window. She asked to speak to Hafen because he owed her money. Defendant recalled telling her that Hafen was "not feeling good"; defendant told Felix to go to the office and get a check from Santa Ana.

At the time of the initial interview, Detective Knowlton observed no discoloration in defendant's eyebrow area, although it might have been slightly swollen, and no mark on her jaw line.

At the hospital, Detective Knowlton continued speaking with defendant. Defendant said that she left Hafen's house early Monday evening after speaking with Bernice, the neighbor across the street. Defendant drove around for a while and then went to her mother's house. Defendant was feeling unwell and sick to her stomach. She never called Hafen.

Defendant denied having Hafen's wallet and belongings, which were not at his house. Hafen's identification and his debit card were later found in her truck. Detective Knowlton asked defendant whether she had seen Hafen disassemble his cell phone on Friday night but she could not recall that. Hafen's cell phone was found in his pantry; it had been disassembled and its battery had been removed.

Defendant confirmed that Hafen had served her with an eviction notice and indicated that he had placed her belongings in storage. She acknowledged that, two weekends earlier, Hafen had returned a ring that defendant had given him because he did not want it anymore.

Defendant claimed that defendant had tried to pull her out of bed by her feet and he had held her against the wall with a pipe-like object. Defendant indicated that Hafen was trying to leave the bedroom but she did not want him to leave because he was under the influence due to medication he had taken. Defendant told the detective that she calmed Hafen down and he crawled into bed. She explained that she had hit Hafen because "he came at her." Defendant admitted placing additional blankets on Hafen.

33

During the next day's interview in jail, defendant told Detective Knowlton that she had hit Hafen because "he was coming after [her] to hit [her]." Hafen had gone into a rage and he had hurt the bridge of her eyebrow and hit her in the face. Defendant claimed that Hafen said he was going to kill her. When Hafen was back in bed and wanted to sleep, defendant grabbed "the bar" and hit Hafen in the head at least three or four times. Hafen slid off the bed onto the floor. Blood was coming out. Defendant grabbed a plastic bag to keep the carpet from getting dirty and put it over Hafen to catch some of the blood. Defendant related that she had said to herself, "God damn it, why did I do that." Defendant did not call police on Friday night because she was scared. She claimed that she did not know he was dead. Defendant admitted putting air freshener in the dish "because of the smell in the room" but she indicated she put it out before he died because "the bathroom smelled like urine."

Defendant believed that Hafen had "fooled around" with Felix in the guest bedroom earlier that week and, at some point, she suggested that the detective check the sheets. Defendant suspected that Felix was not cleaning the house at all.

Deputy Sheriff Christine Dorgan indicated that, on September 3, 2010, she heard defendant, who was in jail, state that she was not receiving her medication and she could "get real creative on how to kill herself."

Defendant's sister, Maria Teresa Garza-Picazo, knew Hafen through defendant and she had rented some property from him. When Hafen and the sister spoke during the summer of 2010, Hafen told the sister that he wanted a friendly relationship with defendant but not "a boyfriend-girlfriend relationship." He told her that he thought someone had been poisoning his food. Hafen told her that he had evicted defendant, changed all his locks, and thrown away all his food. He indicated that he would make sure defendant was taken care of. Hafen had previously purchased a truck for defendant. Defendant's sister thought Hafen was "a nice guy." The sister thought defendant was paranoid.

34

Dr. Alfred Sadler, a board certified urgent care specialist, was defendant's principal physician. He saw defendant on an intermittent basis. She never confided in Dr. Sadler that she was being physically or sexually abused and he saw no evidence of such abuse. On numerous occasions, defendant was depressed or very anxious or she had trouble sleeping and the doctor prescribed medication for those ailments.

Nevin Miller met Hafen in about December 2004. Hafen brought Miller into his law practice with the idea that Miller would take over the practice when Hafen retired. Hafen showed Miller the ropes, gave Miller some cases, and helped Miller with advertising. Miller testified that Hafen "never got angry or showed any kind of anger towards any of his clients." He remembered that defendant was constantly coming into Hafen's office. She had a very loud voice and she disrupted the office.

James Dozier, a criminal defense lawyer, shared office space with Hafen. Dozier described Hafen as "fairly laid back most of the time." Dozier described defendant as loud and very disruptive. She sometimes engaged the clients in inappropriate conversations. In Dozier's opinion, defendant was not "particularly truthful" and she had a character for violence.

On one occasion, when Dozier said something that defendant did not like, defendant punched Dozier in the kidney area, which was painful. Once Dozier discovered a kitchen knife, at least 12 inches long, stuck through and left in the cushion of Hafen's chair. On another occasion, defendant called the secretary's cell phone to inform her that the reason the office telephones were not ringing was that somebody had sabotaged the power wires. When he went out to the rear porch after defendant's call, Dozier discovered that the power cord to the phone system "had been ripped out."

Sometime within the four months prior to Hafen's death, Dozier had seen Hafen, who appeared to be in a stupor, fall out of his chair and not be able to get up for five minutes. Although he had been "loopy," Hafen had not been angry, violent, or volatile. Close to the time when Hafen was discovered deceased, defendant, who was agitated,

35

demanded to speak with Dozier and pushed her way into his office. Defendant had told Dozier that Hafen's new girlfriend was "doping him or sneaking drugs into his food and drink. . . ." Dozier asked defendant to leave.

Sheryll Hafen[5] was married to Hafen in 1992 and, although they legally separated in about 1995, a dating relationship continued until about 2000. When asked whether Hafen had ever been abusive during their marriage, Sheryll stated: "Never, ever, ever in a million years. Mark was a saint. He was an angel."

When Sheryll's middle son turned 18 in about 2007, Sheryll contacted Hafen for help with the son's custodial account and subsequently stayed in contact with him. They would sometimes talk during Hafen's commute to work from the Lake Don Pedro house in about 2008 or 2009. Hafen told Sheryll that defendant was "insanely jealous" and she "became extremely violent when she drank." Hafen told his ex-wife that, when he ended the relationship with defendant, he would have to "get a restraining order." Hafen confided defendant had come at him with a hammer.

On October 25, 2001, Jonathan Smith, who was then a Salinas police officer, served defendant with the OSC in the matter of *LeGault v. Turner*.

II

*Discussion*

A. *Instruction regarding Prior Incidents of Uncharged Domestic Violence*

1. *Background*

The trial court instructed the jury regarding the evidence of uncharged domestic violence pursuant to CALCRIM No. 852. The pattern instruction required the court to insert the specific charged offense involving domestic violence. (See CALCRIM No. 852 (2012 ed.) pp. 637-638.)

---

[5]     For the sake of clarity, we will refer to Sheryll Hafen as Sheryll since she shares a surname with Mark Hafen.

36

The trial court told the jury: "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically, incidents involving Gordon LeGault, Randy Wilson and Mark Hafen." The court defined "[d]omestic violence" to mean "abuse committed against an adult who is a cohabitant, former cohabitant or person who dated or is dating the defendant." It also defined "[a]buse" and "cohabitants" and described the nonexclusive factors that may determine whether persons are cohabitating. The court explained the People's burden of proof to prove uncharged domestic violence.

The trial court further instructed regarding the evidence of uncharged domestic violence: "If you decide that the defendant committed the uncharged domestic violence, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit and did commit murder as charged here. [¶] If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder. The People must still prove the charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility."

2. *Analysis*

Defendant now challenges the instruction given on the ground that "there was no factual foundation to support the premise that [her] history of domestic violence established a predisposition to commit murder." She argues that the instruction given allowed the impermissible inference that her prior history of domestic violence showed a disposition to commit murder.

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (§ 1101, subd. (a) . . . ; Cal. Law Revision Com. com.,

37

reprinted at 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, p. 221; see *People v. Carter* (2005) 36 Cal.4th 1114, 1147 [32 Cal.Rptr.3d 759, 117 P.3d 476].)" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) Evidence Code section 1109 sets forth specific exceptions to that general rule. Subdivision (a)(1) of Evidence Code section 1109 specifically provides: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of *an offense involving domestic violence*, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[6] (Italics added.)

Appellant does not dispute that her acts of prior domestic violence were admissible to show her propensity for domestic violence. She maintains that the instruction went too far by permitting the jury to infer from her prior acts of domestic violence that she had a propensity to murder. She asserts: "[T]here was no evidence in the record to support that inference. Hundreds, if not thousands, of people commit acts of domestic violence. Only a handful of those commit murder."

First, evidence is relevant if it has "*any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) The reason for the general rule against the admission of character evidence is "not that such evidence is never relevant; to the contrary, the evidence is excluded because it has *too much probative value*." (*People v. Guerrero* (1976) 16 Cal.3d 719, 724, italics added.)

---

[6] Evidence Code section 1109 further provides in part: "(e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice. [¶] (f) Evidence of the findings and determinations of administrative agencies regulating the conduct of health facilities licensed under Section 1250 of the Health and Safety Code is inadmissible under this section."

Second, the broad definitions of "domestic violence" and "abuse" certainly encompass murder of a cohabitant or former cohabitant. For purposes of Evidence Code section 1109, " '[d]omestic violence' has the meaning set forth in Section 13700 of the Penal Code."[7] (Evid. Code, § 1109, subd. (d)(3).) Section 13700, subdivision (b), states in part: " 'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." It defines "abuse" to mean "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).)

In *People v. Brown* (2011) 192 Cal.App.4th 1222 (*Brown*), the defendant unsuccessfully contended that Evidence Code section 1109 "permits the admission of

---

[7] Evidence Code section 1109, subdivision (d)(3), also provides: "Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." Family Code section 6211, a provision of the Domestic Violence Prevention Act (Fam. Code, § 6200), states a broader definition of domestic violence: " 'Domestic violence' is abuse perpetrated against any of the following persons: [¶] (a) A spouse or former spouse. [¶] (b) A cohabitant or former cohabitant, as defined in Section 6209. [¶] (c) A person with whom the respondent is having or has had a dating or engagement relationship. [¶] (d) A person with whom the respondent has had a child, where the presumption applies that the male parent is the father of the child of the female parent under the Uniform Parentage Act (Part 3 (commencing with Section 7600) of Division 12). [¶] (e) A child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected. [¶] (f) Any other person related by consanguinity or affinity within the second degree." For purposes of that act, " 'abuse' means any of the following: [¶] (1) Intentionally or recklessly to cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." (Fam. Code, § 6203 subd. (a).)

39

prior acts of domestic violence only in a subsequent prosecution for a domestic violence offense," but not in a murder prosecution. (*Brown*, *supra*, at pp. 1233-1234.) In *Brown*, four former girlfriends "separately testified about a series of domestic violence acts that defendant committed against them" at his trial for murdering a fifth former girlfriend. (*Id.* at pp. 1226, 1230-1231.) The appellate court considered the legislative history of Evidence Code section 1109, which disclosed that the Legislature was aware that an unlawful killing may constitute domestic violence. (*Brown*, *supra*, at pp. 1236-1237.) As noted in *Brown*, an analysis of the bill enacting section 1109 stated: "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner." (Assem. Com. on Public Safety, analysis of S.B. 1876 (1995-1996 Reg. Sess.) pp. 3-4.)

The appellate court concluded in *Brown*: "Given the legislative history and the language of section 1109, we agree with the trial court's observation in this case that murder is 'the ultimate form of domestic violence,' and that defendant's prior acts of domestic violence were admissible based on the nature and circumstances of his relationship with and conduct toward Bridget. Defendant was charged with first degree murder based on strangling Bridget, his former girlfriend, after a lengthy period in which he tried to intimidate her because she chose to break up with him. He was clearly 'accused of an offense involving domestic violence' within the meaning of section 1109." (*Brown*, *supra*, 192 Cal.App.4th at p. 1237.)

40

As explained in Wigmore on Evidence, "[a] defendant's character . . . as indicating the probability of his [or her] doing or not the act charged, is essentially relevant. . . . The character or disposition—i.e., a fixed trait or sum of traits—of the persons we deal with is in daily life always more or less considered by us in estimating the probability of their future conduct. In point of legal theory and practice, the case is no different." (1A Wigmore on Evidence (1983) § 55, pp. 1157, 1159, fn. omitted.) Evidence of defendant's prior acts of domestic violence was circumstantially relevant to show her disposition or propensity to commit domestic violence, which in turn was probative with regard to whether she committed murder as charged. (See Evid. Code, § 210; see also 1A Wigmore on Evidence, *supra*, § 55.1, p. 1160; cf. *People v. Falsetta* (1999) 21 Cal.4th 903, 915 [Evid. Code, § 1108].)

Third, the challenged instruction did not permit the jury to infer that defendant was guilty of murder based solely upon evidence of uncharged domestic violence but, rather, made clear that the evidence of uncharged domestic violence was "not sufficient by itself to prove that the defendant is guilty of murder" and that the People were still required to prove the charge beyond a reasonable doubt. The instruction permitted the jury to find that defendant had a propensity to commit domestic violence based upon the evidence of uncharged domestic violence and to conclude, based in part on its consideration of that evidence together with other evidence, that defendant committed murder as charged. The instruction properly allowed the jury to draw reasonable inferences.

"Instruction on an entirely permissive inference is invalid as a matter of due process only if there is no rational way the jury could draw the permitted inference. (See *Ulster County Court v. Allen* (1979) 442 U.S. 140, 157, 165 [60 L.Ed.2d 777, 797, 99 S.Ct. 2213]; *Leary v. United States* (1969) 395 U.S. 6, 36 [23 L.Ed.2d 57, 81-82, 89 S.Ct. 1532]; *Tot v. United States* (1943) 319 U.S. 463, 467 [87 L.Ed. 1519, 1524, 63 S.Ct. 1241].)" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243-1244.) That is not the case

41

here. Since we find no instructional error, it is unnecessary to reach the issue of prejudice.

B. *Admission of Deceased Victim's Out-of-Court Statements*

1. *Procedural Background*

Before trial, defendant filed written motions in limine to exclude Hafen's out-of-court statements regarding (1) an incident occurring about a year prior to Hafen's death in which defendant stood over his bed holding a hammer and (2) defendant's attempts to poison him on two separate occasions. Defendant asserted that evidence of this hammer incident was too remote in time, no longer probative, and highly prejudicial. She sought to exclude Hafen's statements about the alleged poisoning attempts on grounds of untrustworthiness. She maintained that those latter statements were untrustworthy because they were self-serving in that one claim of poisoning arose after Hafen was taken to the hospital for an apparent drug overdose and another claim of poisoning arose after he was arrested for driving under the influence about a month before his death. In both instances, drug testing showed that the only substances in Hafen's blood were medications he was reportedly taking.

Before trial, the prosecutor filed a written in limine motion seeking the admission of Hafen's out-of-court statements relevant to his state of mind. The prosecutor asserted that defendant had placed Hafen's state of mind at issue by claiming he had abused her during their relationship.

The prosecutor proffered statements made to Hafen's secretary, his housekeeper, and defendant's sister that he was scared of defendant and, "if anything happened to him it would be caused by the defendant" and a statement made to his secretary that defendant "may try to kill him." In addition, Hafen had "told his daughter in law and his son that the defendant had slipped some drug into his beer in 2006 [and she] had put something in his food in July or August of 2010." Hafen had also stated to his secretary that he had been "drugged or poisoned" "in June 2010, which resulted in him being transported to the

42

hospital[,] and again on August 3, 2010, when he was in a car accident and arrested for DUI."

The prosecution also proffered Hafen's statements contained in a written declaration, made under penalty of perjury, supporting his request for order, filed in May 2009 in Mariposa County. According to the prosecution's motion, Hafen disclosed in his written declaration that defendant had committed many acts of violence against him and his property, including scratching his truck, breaking a taillight, and stealing his cell phone. Hafen had allowed defendant to temporarily move into his home but she had overstayed the agreed term. The in limine motion specified that, in his declaration, "[Hafen] outline[d] that on 5/17/2009 [defendant] threatened to hit him with a hammer and did in fact swing a hammer at his head. Due to this incident he removed himself from the residence. He asked the court [to order] that she be removed from his property, have no contact with, commit no act of aggression or violence against him and not destroy any part of his home." The motion indicated that Hafen had told his secretary, housekeeper, and ex-wife about this hammer incident.

At the hearing on the motions on November 20, 2012, defense counsel asked the court to exclude defendant's statements regarding the May 17, 2009 hammer incident because Hafen had not followed through with his request for a restraining order, which he asserted indicated that Hafen's statements about that hammer incident were "not reliable" and "extremely prejudicial." The court found Hafen's statements concerning this hammer incident "extremely probative" and not unduly prejudicial in that they were relevant to the nature of their relationship and who was the aggressor in the events leading to Hafen's death.

The trial court and counsel discussed other statements made by Hafen indicating that defendant had tried to poison him or "mess him up," including a 2006 statement that defendant slipped drugs into his beer made to his son and daughter-in-law and a statement in July or August 2010 that defendant had put something in his food.

43

Defense counsel had no objection to the admission of that evidence. The trial court ruled that those statements were admissible.

The court also ruled on the prosecutor's request to admit Hafen's statements relevant to his state of mind. The court ruled that it would admit those statements under "a variety of theories, including state of mind . . . ." The court believed the evidence was "particularly relevant in a self-defense case."

At trial, a number of witnesses testified to Hafen's statements of his state of mind or his statements circumstantially relevant to his state of mind. The trial court admitted into evidence the People's exhibit No. 32, which included Hafen's request for order (Domestic Violence Prevention) and supporting declaration and exhibits, filed May 20, 2009, in Mariposa County Superior Court.

2. *Analysis*

a. *Contentions*

Defendant now asserts that Hafen's out-of-court statements to Felix, Santa Ana, Garza-Picazo, and Sheryll (see fn. 5, *ante*) were inadmissible hearsay, which the trial court erroneously admitted under Evidence Code section 1250, a state of mind exception to the hearsay rule. Defendant makes the same argument with respect to Hafen's written statements in support of his request for domestic violence prevention orders. She maintains that none of the evidence to prove Hafen's state of mind was admissible because his state of mind was irrelevant to any question at issue. Defendant also asserts that the improper admission of state of mind hearsay violated the state and federal confrontation clauses and the hearsay constituted "improper bad character evidence contrary to the due process clause[s] of the 5th and 14th Amendements."

b. *The Relevance and Admissibility of Evidence of Hafen's State of Mind*

In this case, the challenged out-of-court statements to prove Hafen's state of mind fell into one of two categories: (1) Hafen's statements of his state of mind offered for their truth and (2) Hafen's statements constituting circumstantial evidence of his state of

mind offered for that nonhearsay purpose. Since statements in the latter category do not qualify as hearsay, no hearsay exception was required for their admission for that nonhearsay purpose.[8]

As to defendant's out-of-court statements of his state of mind, we consider Evidence Code section 1250, subdivision (a), which states an exception to the hearsay rule. It provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

Defendant asserts that the hearsay exception set forth in Evidence Code section 1250 was inapplicable because Hafen's state of mind was not at issue in this case and there was no factual question regarding Hafen's behavior. Evidence of hearsay statements of state of mind are admissible, however, as an exception to the hearsay rule when "offered to prove . . . acts or conduct of the declarant." (Evid. Code, § 1250 subd. (a)(2).) "Statements of a decedent's then existing fear—*i.e.*, his state of mind— may be offered under Section 1250 . . . to prove or explain the decedent's subsequent conduct." (Assem. Com. on Judiciary com., 29B Pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, p. 282.) In this case, defendant did raise an issue of fact concerning defendant's conduct by claiming at trial that Hafen was physically abusive during their

---

[8] " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Under the Evidence Code, no hearsay problem is involved if the declarant's statements are not being used to prove the truth of their contents but are being used as circumstantial evidence of the declarant's mental state. [Citation.]" (Assem. Com. on Judiciary com., 29B Pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, p. 281; see *id*. at p. 282.)

relationship and he was the initial aggressor in the events leading to his death and defendant believed she was acting in self-defense.

The California Supreme Court recently explained: "Our cases repeatedly have held that under Evidence Code section 1250, a victim's out-of-court statements expressing fear of a defendant are relevant only when the victim's conduct in conformity with that fear is in dispute. [Citations.] We have upheld the admission of such evidence under Evidence Code section 1250 when the victim's fearful state of mind rebutted the defendant's claims that the victim's death was accidental (*People v. Lew* (1968) 68 Cal.2d 774, 778-780 . . . ), or provoked (*People v. Spencer* (1969) 71 Cal.2d 933, 945-946 . . .) . . . ."[9] (*People v. Riccardi, supra*, 54 Cal.4th at p. 816.) A murder victim's fear of the alleged killer may be "in issue when, according to the defendant, the victim has behaved in a manner inconsistent with that fear [citation]." (*People v. Hernandez* (2003) 30 Cal.4th 835, 872-873 disapproved on another point in *People v. Riccardi, supra*, 54 Cal.4th at p. 824, fn. 32.) "[W]here the defendant claims self defense or that the killing was accidental, then statements by the victim showing his fear of the defendant may be admitted to show that the victim would not likely have been an aggressor against the defendant or would not likely have allowed himself to be in the position in which the defendant claims the accident occurred. (See *People v. Lew* (1968) 68 Cal.2d 774, 779-780.)" (*People v. Garcia* (1986) 178 Cal.App.3d 814, 822.)

In *People v. Spencer, supra*, 71 Cal.2d 933, one of the cases cited by the Supreme Court in *People v. Riccardi, supra*, 54 Cal.4th 758, the killer and the deceased had been in a lesbian relationship. (*People v. Spencer, supra*, at p. 935.) The California Supreme

_____

[9]    The Supreme Court has also held that "evidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it. [Citations.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 820.)

46

Court determined that the defendant's "claim of self-defense in the instant case raises a question of fact with respect to [the deceased's] conduct on May 5, i.e., whether or not she was the aggressor, and therefore [the victim's] statement is admissible 'to prove or explain [her] acts or conduct.' ([Evid. Code,] § 1250, subd. (a)(2).)" (*Id.* at p. 946, fn. omitted.) The court explained: "Reasonably interpreted, [the deceased's] statement that 'I might get killed over it . . .' expresses her fear that defendant might become violent once [the deceased] broke up with her. From this fear it could be inferred that [the deceased] was not the aggressor and that in fact defendant attacked [the deceased]. As we said in *People v. Lew*, *supra*, 68 Cal.2d at page 779 . . . [,] 'Or had defendant claimed self-defense, he would have placed . . . [the victim's] state of mind at issue since a claim of self-defense requires the trier of fact to find that the other party was the aggressor, the prosecution, through rebuttal testimony, could have shown that [the victim] *was apprehensive and not likely to be aggressive*. Her fear would then have been a factor properly before the factfinder in its deliberations on the defendant's claim of self-defense.' (Italics added.)" (*Id.* at pp. 945-946, fns. omitted; see *People v. Romero* (2007) 149 Cal.App.4th 29, 37-38.)

Since defendant was claiming in this case that Hafen had physically abused her on a number of occasions and she killed Hafen in self-defense, Hafen's hearsay statements that he was afraid of defendant were admissible as an exception to the hearsay rule under Evidence Code section 1250, subdivision (a)(2), to show he behaved in conformity with his state of mind.

c. *Relevance of Hafen's Earlier State of Mind*

Defendant contends that Hafen's state of mind in 2008 or 2009 was irrelevant. We disagree.

"A statement of the declarant's then existing state of mind is also admissible when relevant to show the declarant's state of mind at a time prior or subsequent to the statement. [Citations.]" (Assem. Com. on Judiciary com., 29B Pt.4 West's Ann.

47

Evid. Code (1995 ed.) foll. § 1250, p. 280.) The evidence of Hafen's fear of defendant on earlier occasions together with more recent state of mind evidence tended to show that his fear of defendant was longstanding and continued at the time of his killing, which in turn was circumstantial evidence of Hafen's conduct in conformity with his state of mind. (See Evid. Code, § 210; see also 2 Wigmore, Evidence (Chadbourn rev. ed. 1979) § 387, p. 416.) Consequently, contrary to defendant's suggestion, Hafen's state of mind was relevant to the disputed issue whether Hafen was the aggressor in their interactions culminating in his death. (See *People v. Garcia*, *supra*, 178 Cal.App.3d at p. 822; *People v. Spencer*, *supra*, 71 Cal.2d at pp. 945-946; see also *People v. Atchley* (1959) 53 Cal.2d 160, 172.)

3. *Constitutional Claims*

Citing the California Constitution, article I, sections 15 and 16, the Sixth and Fourteenth Amendments to the United States Constitution and *Delaware v. Van Arsdall* (1986) 475 U.S. 673 [106 S.Ct. 1431], defendant asserts that the improper admission of hearsay state-of-mind evidence "violated the state and federal confrontation clauses." Defendant has not demonstrated, by specific citation to the appellate record, that she objected below on these constitutional grounds. Accordingly, she forfeited such claims. (See Evid. Code, § 353; *People v. Redd* (2010) 48 Cal.4th 691, 730 & fn. 19; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; see also *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314 [129 S.Ct. 2527] ["right to confrontation may, of course, be waived, including by failure to object to the offending evidence"].)

Moreover, the right to confrontation was not implicated with respect to the evidence offered to circumstantially prove Hafen's state of mind and not to prove the truth of the matter asserted. "[T]here are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes." (*People v. Cage* (2007) 40 Cal.4th 965, 976, fn. 6; see *Crawford v. Washington* (2004) 541 U.S. 36, 59-60 [124 S.Ct. 1354], fn. 9.) In addition, defendant fails to establish that Hafen's statements

made to individuals in his life were testimonial. The right to confrontation does not bar admission of nontestimonial hearsay statements. (See *Michigan v. Bryant* (2011) 562 U.S. 344 [131 S.Ct. 1143, 1167]; *Giles v. California* (2008) 554 U.S. 353, 376 [128 S.Ct. 2678]; *Crawford v. Washington*, *supra*, at pp. 51 ["not all hearsay implicates the Sixth Amendment's core concerns"], 68; see *People v. Gutierrez* (2009) 45 Cal.4th at pp. 812-813 [three-year-old boy's hearsay statement to his aunt was not testimonial and its admission did not violate the defendant's Sixth Amendment right to confront witnesses].)

Defendant also insists that Hafen's hearsay state-of-mind statements were "improper bad character evidence in violation of the due process clause[s] of the 5th and 14th Amendments" to the United States Constitution. Defendant did not object to the admission of Hafen's statements on due process grounds and, therefore, such objection was also forfeited.[10] (Evid. Code, § 353; see *People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.) Moreover, "[t]he routine and proper application of state evidentiary law does not impinge on a defendant's due process rights. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 . . . .)" (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 809.)

C. *Trial Court Had No Duty to Give a Limiting Instruction*

Defendant asserts that the trial court had an obligation to instruct sua sponte that Hafen's statements were admitted for the limited purpose of showing his state of mind and they were not admitted for their truth. Hafen's statements of his state of mind that were admitted under a hearsay exception were admitted for their truth (see Evid. Code, §§ 1200, subd. (a), 1250, subd. (a)(2)) and, consequently, they were not subject to such a

---

[10] Defendant has not established that the trial court erroneously overruled a timely and specific evidentiary objection and, consequently, she is not in the position to argue the asserted error in admitting the evidence over proper objection "had the additional legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

limiting instruction. As to Hafen's statements that were admitted as circumstantial evidence of his state of mind toward defendant and not for their truth, the trial court had no duty to provide such instruction on its own motion. (See *People v. Riccardi*, *supra*, 54 Cal.4th at p. 824; Evid. Code, § 355.)

D. *Ineffective Assistance of Counsel*

Insofar as we can discern, defendant now contends that her trial counsel provided ineffective assistance of counsel "insofar as she only objected to some, but not all, of those threats, and only objected on some, but not all, of the grounds asserted here" and by not requesting a limiting instruction.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. ([*Strickland v. Washington* (1984) 466 U.S. 668,] 687-688, 693; [*People v. Ledesma* (1987) 43 Cal.3d 171,] 216.) Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland*, at pp. 687-688.) Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Id*. at pp. 693-694.)" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

"Where 'there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance.' (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635].)" (*People v. Majors* (1998) 18 Cal.4th 385, 403.) Further, "[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence. [Citations.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 621.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within

the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Defendant has not demonstrated that her trial counsel performed deficiently by not objecting to the admission of evidence on the ground of relevance or hearsay or some other basis. Moreover, "[i]f evidence is relevant and admissible for one purpose, but inadmissible if considered for another purpose, *the trial court must admit it* but, upon request, limit its proper scope and so instruct the jury. (Evid. Code, § 355.)" (*People v. Bryant* (2014) 60 Cal.4th 335, 405, italics added.) Both direct and circumstantial evidence of Hafen's state of mind toward defendant was relevant to his conduct immediately preceding his death (see Evid. Code, § 210; Assem. Com. on Judiciary com., 29B Pt.4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, pp. 281-282) and, therefore, admissible. (See Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible"]; Cal. Const. art. I, § 28, subd. (f)(2) [Right to Truth-in-Evidence provision].)

As explained, defendant was not entitled to an instruction limiting consideration of Hafen's statements of his state of mind to nonhearsay purposes since they were offered for their truth. Defense counsel may have reasonably decided not to request a limiting instruction with regard to the circumstantial evidence of Hafen's fear of defendant because such instruction would have highlighted those statements. (See *People v. Hinton* (2006) 37 Cal.4th 839, 878; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.) Defense counsel focused on defendant's version of events in which defendant was a

51

battered woman, Hafen was the aggressor, and defendant believed she was acting in self-defense.

Defendant has failed to establish her counsel rendered ineffective assistance.

E. *Defendant's Brandishing Conviction and Her Underlying Conduct*

1. *Background*

Defendant moved in limine "to exclude any and all references to and underlying facts regarding any convictions suffered by her" "[p]ursuant to Evidence Code sections 210 and 352." The People moved in limine to impeach defendant with evidence of her prior misdemeanor conduct.

The prosecution's motion described defendant's conduct against Shawn Mares: "In 2000, the defendant assaulted an employee with a golf club while he lay in his bed and inflicted an injury upon his back and arm." "Mares sustained a large knot and welt on his arm in the shape of the golf club head. He also sustained a[n] 'L' shaped mark on his back consistent with where the shaft of the club meets the golf club head. After she struck him with the golf club[,] she brandished a knife threatening to cut his 'nuts' off with it." According to the moving papers, defendant was charged with assault with a deadly weapon but she was convicted of a misdemeanor, brandishing a weapon (§ 417, subd. (a)(1)).[11]

In ruling on the parties' motions in limine, the trial court determined that "the misdemeanor 417 is a crime of moral turpitude." When the court described the incident in keeping with the prosecution's motion, defense counsel confirmed that this conduct was "the misdemeanor 417." The court granted the defense motion to bar the prosecution

---

[11]     In 2000, section 417, subdivision (a)(1), provided in pertinent part: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days." (Stats. 1998, ch. 190, § 1, p. 985; see § 417, subd. (a)(1).)

from mentioning the misdemeanor conviction and the underlying facts during its case in chief.

At trial, during her own testimony on direct examination, defendant admitted that, in 2001, she pleaded to a misdemeanor of brandishing a weapon (§ 417).  She described some of what had occurred.

2.  *Governing Law*

"[I]f past criminal conduct amounting to a misdemeanor has some logical bearing upon the veracity of a witness in a criminal proceeding, that conduct is admissible, subject to trial court discretion, as 'relevant' evidence under section 28[, subdivision] (d) [now § 28, subd. (f)(2)]" of article I of the California Constitution (Right to Truth-in-Evidence provision).  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 (*Wheeler*).) "Misconduct involving moral turpitude may suggest a willingness to lie [citations] . . . ." (*Id*. at pp. 295-296.)  " '[M]oral turpitude' refers to a general ' "readiness to do evil" ' even if dishonesty is not necessarily involved.  (*People v. Castro* (1985) 38 Cal.3d 301, 315 . . . ; see *Wheeler*, *supra*, 4 Cal.4th 284, 295.)"  (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24.)  "[I]t is undeniable that a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty." (*People v. Castro*, *supra*, at p. 315.)

In *Wheeler*, the Supreme Court concluded, under then-existing law, that "evidence of a misdemeanor *conviction*, whether documentary or testimonial, is inadmissible hearsay when offered to impeach a witness's credibility."  (*Wheeler*, *supra*, 4 Cal.4th at p. 300, fn. omitted; see *id*. at p. 288; Evid. Code, §§ 788, 1200; Sen. Com. on Judiciary com., 29B Pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 788, pp. 663-664.)  The Supreme Court observed, however, that "[n]othing in the hearsay rule precludes proof of impeaching misdemeanor misconduct by other, more direct means, including a witness's admission on direct or cross-examination that he or she committed such conduct." (*Wheeler*, *supra*, at p. 300, fn. 14.)

At the time of trial, Evidence Code section 452.5, subdivision (b), which was enacted subsequent to *Wheeler*, provides:  "An official record of conviction certified in accordance with subdivision (a) of Section 1530 is admissible pursuant to Section 1280 [record made by public employee] to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record."  (Stats. 2002, ch. 784, § 102, p. 4779.)  That section "creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred."  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460.)  Evidence Code section 452.5, subdivision (b), does not establish hearsay exception for testimonial proof of a misdemeanor conviction.

a. *Analysis*

Defendant insists that the crime of brandishing does not involve moral turpitude within the meaning of *Wheeler*, *supra*, 4 Cal.4th 284.  Citing *People v. Mansfield* (1988) 200 Cal.App.3d 82 (*Mansfield*), she argues that it is "a far less serious crime than a [felony] battery with great bodily injury . . . ."  In *Mansfield*, the Fifth District held a felony *conviction* of battery resulting in serious bodily injury (§ 243, subd. (d)) did not necessarily involve moral turpitude and, therefore, the trial court erred in admitting evidence of that conviction for impeachment.  (*Mansfield*, *supra*, at p. 89.)

*Mansfield*'s reasoning was as follows.  The least touching may constitute the crime of battery.[12]  (*People v. Mansfield*, *supra*, 200 Cal.App.3d at p. 88.)  "A person need not have an intent to injure to commit a battery.  He only needs to intend to commit the act.  [Citation.]  Thus, a simple battery does not necessarily show readiness to do evil

---

[12]  " 'It has long been established that "the least touching" may constitute battery.  In other words, force against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave a mark.'  [Citations.]"  (*People v. Shockley* (2013) 58 Cal.4th 400, 404-405.)

or necessarily involve moral turpitude. (See *People v. Cavazos* [(1985) 172 Cal.App.3d 589,] 594.)" (*Ibid.*) "The offense of felony battery is a simple battery which results in serious bodily injury." (*Ibid.*) "[T]he state of mind necessary for the commission of a battery with serious bodily injury is the same as that for simple battery; it is only the result which is different. It follows that because simple battery is not a crime involving moral turpitude, battery resulting in serious bodily injury necessarily cannot be a crime of moral turpitude because it also can arise from the 'least touching.' Although serious injury resulting from a simple offensive touching may not be likely, in determining whether a certain crime is one of moral turpitude, the reviewing court may not go behind the conviction and take evidence on the underlying facts. (*People v. Castro*, *supra*, 38 Cal.3d at p. 317.)" (*Ibid.*, fn. omitted.)

In *Mansfield*, the appellate court concluded: "[T]he least adjudicated elements of battery resulting in serious bodily injury do not necessarily involve force *likely* to cause serious injury. Again, since it is the least adjudicated elements of a crime which are looked to in determining whether the crime is one of moral turpitude, and the crime at issue on this appeal can occur from the least offensive 'push,' it is not a crime of moral turpitude." (*Mansfield*, *supra*, 200 Cal.App.3d at pp. 88-89.) This case is distinguishable from *Mansfield*.

The prosecution in *Mansfield* sought to impeach defendant with a felony conviction whereas, before trial in this case, the prosecution sought a ruling permitting the People to impeach defendant with her misdemeanor conduct. In addition, unlike the crime of felony battery, the crime of brandishing necessarily involves a deadly weapon other than a firearm.[13] (See fn. 11, *ante*.)

---

[13] A golf club may constitute a deadly weapon. (See *People v. Rhodes* (1989) 215 Cal.App.3d 470, 475, disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 198, fn. 7; see also *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [objects not inherently deadly or dangerous may be deadly weapons].)

Defendant now argues that brandishing a golf club does not involve moral turpitude because "[e]very weekend, millions of people wave golf clubs in the air" and "[t]ypical damage is restricted to the golf ball, and, perhaps, to the golfer's ego." Here, of course, defendant's conduct involved more than waving a golf club in the air. She struck someone with the club and then, apparently, displayed a knife and threatened injury.

In *People v. Rivera* (2003) 107 Cal.App.4th 1374, this court determined the trial court did not err in allowing the defendant to be impeached with his prior juvenile adjudication for misdemeanor possession of a deadly weapon with intent to commit an assault. (*Id*. at p. 1382.) We observed that "although simple assault is not a crime of moral turpitude, assault with a deadly weapon is." (*Ibid*.; see *People v. Thomas* (1988) 206 Cal.App.3d 689, 694-695, 700.) " 'The average person walking down the street would believe that anyone who unlawfully attempts to injure another with a deadly weapon is guilty of some degree of moral laxity.' ([*People v. Cavazos* (1985) 172 Cal.App.3d 589,] 595.)" (*People v. Rivera*, *supra*, at p. 1382.) We concluded that possession of a deadly weapon with intent to commit an assault involves a general readiness to do evil. (*Ibid*.)

Defendant's misdemeanor conduct, assaultive use of a golf club, involved some degree of general readiness to do evil or moral turpitude. As observed in *Castro*: " '[C]onvictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity.' [Citation.] 'Not as heavily' does not, of course, mean 'not at all.' " (*People v. Castro*, *supra*, 38 Cal.3d at p. 315.) Further, " '[w]hether the trial court admits evidence of past misconduct should be determined solely on the basis that that conduct evinces moral turpitude. The label is not important [i.e., what type of statutorily defined offense, if any, the conduct constitutes]—the conduct is.' (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 89-90 . . . .)" (*People v. Ayala* (2000) 23 Cal.4th 225, 273-274.)

Even if we assume that the least adjudicated elements of misdemeanor brandishing do not necessarily constitute a crime of moral turpitude, defendant's underlying conduct clearly did. On direct-examination, defendant chose to admit her misdemeanor conviction and testify about some of the underlying conduct. We discern no reversible error.

## F. *Cumulative Error*

Defendant asserts that the cumulative prejudice of the foregoing errors warrants reversal. We find no basis to reverse.

DISPOSITION

The judgment is affirmed.

57

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.